IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LARRY HURST, individually and
on behalf of all similarly situated,

                    Plaintiff,

    v.

FIRST STUDENT, INC. a foreign
corporation,

                    Defendant.

No. 3:15-cv-00021-HZ

OPINION & ORDER

David A. Schuck
Karen A. Moore
Schuck Law LLC
10013 NE Hazel Dell Ave., Ste. 178
Vancouver, WA 98686

      Attorneys for Plaintiff

//

//

//

Douglas E. Smith
Jennifer Neth Warberg
LeiLani J. Hart
Littler Mendelson, P.C.
121 SW Morrison St., Ste. 900
Portland, OR 97204

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      First Student is a school bus company that provides bus service to several Oregon school districts. A person hoping to drive a bus for First Student must complete a two-week long training program before taking the wheel with students on board. Former First Student employee Larry Hurst seeks to recover, for himself and the approximately 3,000 class members he represents, unpaid minimum wages and penalty wages from Defendant First Student for time he and others spent in that training. First Student argues it does not owe Hurst or the class members any wages for their time in the training program because the driver-trainees were not "employees" as that term is understood under Oregon's minimum wage statutes.

      Currently before the Court are the parties' cross motions for summary judgment. In this Opinion & Order, the Court first explains its choice to apply a federally-developed framework to evaluate whether, under Oregon law, Hurst and the class members were "employees" of First Student while training. Then, after applying the framework, the Court determines that First Student did not employ Hurst or the class members during the training program. Therefore, First Student's motion for summary judgment is granted, and Hurst's motion for summary judgment is denied.

//

//

2 - OPINION & ORDER

BACKGROUND

First Student is an Ohio-based school bus company that contracts with school districts in Oregon and other states. Dorr Decl. ¶ 3, ECF 48. As a part of its service to schools, First Student "provides qualified school bus drivers who meet all state and federal registration, [and] permit and licensing requirements[.]" Dorr Decl. ¶ 3. First Student has an "extensive" hiring process "that includes . . . a written job application, a personal interview, drug testing, dexterity testing, classroom training, [and] behind-the-wheel training[.]" Dorr Decl. ¶ 4. Applicants must also complete "federal and state permit and licensing requirements." Dorr Decl. ¶ 4. First Student has developed a training program that is designed to teach potential drivers what they need to know to secure the proper permits and licenses. Moore Decl. Ex. 5 ("Criddle Dep.") 11:10–18, ECF 50-5.

First Student uses a number of avenues to recruit driver applicants—including online postings on sites like Craigslist or other job boards, to more localized efforts like hosting a "recruiting fair" at a high-traffic location, hanging fliers in laundromats or distributing door-knocker advertisements in areas with a severe driver shortage. Criddle Dep. 39:16–40:18. First Student reviews the applications and offers qualified applicants an interview. Criddle Dep. 10:18–22. If the interview is successful and First Student has determined that the applicant qualifies for it, First Student invites the applicant to join the training program. Criddle Dep. 10: 23–25. First Student provides the applicant a "Contingent Offer of Employment," a representative example of which is reproduced, in relevant part, here:

> [Y]ou have been selected for the Driving position with First Student. We appreciate your interest in becoming part of our team and are excited at the prospect of you joining our transportation family.
>
> You will be paid a one-time bonus of $250.00 . . . after successfully completing all licensing and training requirements.

. . .

Your acceptance of this position is with the understanding that final appointment is contingent upon successful completion of a background investigation . . . as well as obtaining your Commercial Driver's License (CDL) with any necessary endorsements[.]

. . .

To begin the required training for the position, please report at the . . . stated date, time and location: [fields left blank]

. . .

This offer is contingent upon the satisfactory completion of a background investigation as noted above. This letter is not intended as a contract of employment.

. . .

Moore Decl. Ex. 17 at 5–6, ECF 50-17. The Contingent Offer also outlines that First Student requires criminal history and motor vehicle record background checks, a pre-employment drug test, a federally mandated physical exam, a dexterity test, and any applicable state requirements. Moore Decl. Ex. 17 at 5.

The First Student training program includes twenty-four hours of classroom instruction and approximately eighteen hours of behind the wheel training. Smith Decl. Ex. D at 5, ECF 47-4[1]; Smith Decl. Ex. I ("Stipulation of Facts") at 2, ECF 47-10. The classroom instruction focuses on the core skills applicants need to drive a school bus, such as driver qualifications, bus components, emergency and accident procedures, pre- and post-trip inspections, operating the bus's brakes, visual reference points, backing and more. Smith Decl. Ex. D at 2–5. Although the training primarily addressed skills generally applicable to driving a school bus for any company, at times, the training touched on topics specific to First Student, such as its harassment policy, cell phone policy, and its employee handbook. Smith Decl. Ex. D at 5. Hurst testified that these

---

[1] Some exhibits are emblazoned with the logo for Laidlaw International. First Student acquired Laidlaw in 2007. During the time Hurst went through the First Student training program in 2008, First Student was still using some Laidlaw materials for the training program. Moore Decl. Ex. 3 ("Dorr Dep.") 39:9–40:24, ECF 50-3. In 2012, First Student revamped its training and incorporated many of the Laidlaw practices into First Student's new training materials. Dorr Dep. 40:25–46:7.

First Student-specific topics were covered briefly, often in a few minutes or seconds. Smith Decl. Ex. B ("Hurst Dep.") 91:25–94:17.

The behind-the-wheel training also focuses on the general skills an individual would need to drive a school bus, including making right and left turns, safely navigating intersections and railroad crossings, employing defensive driving techniques, and changing lanes. Smith Decl. Ex. D at 3. Driver-trainees must also demonstrate their knowledge of and ability to perform a wide range of "critical tasks" such as using proper driver seating posture, identifying bus and engine components, and executing bus driving techniques like "start bus from a stop on an upgrade with no roll back," or "perform PERFECTLY a railroad crossing procedure." Smith Decl. Ex. E at 2–7, ECF 47-5.

At the end of First Student's training program, state-approved trainers test and certify successful applicants as qualified to receive a school bus driver permit from the state DMV. Criddle Dep. 12:3–12; Hurst Dep. 88:11–14.

Prior to 2009, some First Student locations in the northwest region offered applicants "paid training and testing for CDL Class B License." See Moore Decl. Ex. 13 at 4, ECF 50-13; Moore Decl. Ex. 25, ECF 50-25; Criddle Dep. 21:2–7, 32. In early 2009, a First Student executive clarified in an email to First Student managers in Oregon that First Student would "no longer be paying minimum wage for classroom or behind the wheel training. Rather, [First Student] will be paying all new hires a $250.00 . . . training bonus upon completion of training (when they are licensed to drive a school bus)." Moore Decl. Ex. 25. The policy change was effective February 4, 2009, and covered all new hires subsequent to that date; those individuals already involved in the training program prior to that date were "grandfathered" and paid minimum wage for training "under [the] original program." Moore Decl. Ex. 25.

Hurst applied for a bus driver position with First Student in July of 2008. Smith Decl. Ex. C at 5, ECF 47–3. The location where Hurst applied did not offer paid training, and Hurst testified that he knew the training was unpaid. Criddle Dep. 32:7–11; Hurst Dep. 64:15–65:16. Hurst testified that, at the time, he knew he needed certifications before driving a bus with children on board, and that First Student would not hire him until he completed the training program that qualified him for the certifications. Hurst Dep. 61:25–63:19, 67:14–18. Hurst knew that successfully completing the First Student training program did not guarantee him a job with the company. Hurst Dep. 68:24–69:7.

Hurst began the classroom portion of the training on July 24, 2008, and completed it on August 4, 2008. Hurst Dep. 90:12–23. That same day, he started the behind-the-wheel training and finished on August 8, 2008. Smith Decl. Ex. D at 4. First Student hired Hurst as a bus driver on August 15, 2008. Smith Decl. Ex. C at 2. On October 8, 2008, Hurst left First Student because he was unhappy with the company's "on call" policy. Hurst Dep. 49:1–25. When he left First Student, Hurst received permission to make copies of the First Student training materials. Hurst Dep. 16:22–18:7. A few months later, Hurst enrolled at a driving program at Rogue Community College ("RCC") to get his Class A license, which allowed him to drive larger trucks. Hurst Dep. 18:3–19:21. While attending RCC, Hurst might have used the First Student materials to refresh his recollection of certain topics, but he could not specifically remember. Hurst Dep. 17:22–18:7. Hurst said that the First Student materials on truck inspections and brakes were relevant to the training he received for his Class A license. Hurst Dep. 20:21–25.

Hurst filed a complaint in Multnomah County Circuit Court in April 2013 alleging that he and similarly situated individuals were entitled to unpaid minimum wages for time they spent in

First Student's training program. Defendant's Notice of Removal of Action, Attachment A-1 at

9–12, ECF 1–1. The judge certified the case as a class action on behalf of

> [a]ll persons who attended the bus driver training programs of First Student, Inc.
> (or its predecessor Laidlaw International, Inc.) for bus driver employees or
> prospective employees in Oregon, between April 29, 2007 and April 29, 2013.
> The claims for which the class is to be certified are those stated in plaintiff Hurst's
> complaint in this action arising under state wage and hour laws to recover unpaid
> wages and civil penalties.

Notice of Removal, Attachment A-3 at 346, ECF 1–3. Hurst is the sole class representative. First

Student removed the action to this Court on January 5, 2015, asserting that the case satisfied the

amount-in-controversy and diversity jurisdictional requirements of the Class Action Fairness

Act. 28 U.S.C. § 1332(d)(2). The Court agreed and denied Hurst's subsequent motion to remand

the case to state court. Hurst v. First Student, Inc., No. 3:15-CV-00021-HZ, 2015 WL 2250462,

at *1 (D. Or. May 13, 2015).

Currently before the Court are the parties' cross-motions for summary judgment.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)

(quoting FED. R. CIV. P. 56(c)). Once the moving party meets its initial burden, the burden then

shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed.

Trade Comm'n v. Stefanchik, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks

omitted). The nonmoving party must go beyond the pleadings and designate facts showing an

issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324). The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009).

In evaluating a motion for summary judgment, a district court must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor weigh the evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1112 (9th Cir. 2011).

On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other. See FED. R. CIV. P. 56; Fair Hous. Council v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001); QBE Ins. Corp. v. Creston Court Condo., Inc., 58 F. Supp. 3d 1137, 1143 (D. Or. 2014).

DISCUSSION

Hurst asserts a single claim against First Student: that First Student was required under Oregon minimum wage laws to pay him and other members of the class for all hours worked during the mandatory driver training. The Court must address two issues to decide that question. The first is whether First Student employed Plaintiff and class members during the unpaid driver training. Pl. Mot. at 1, ECF 49. If so, the Court must then determine whether that training is compensable under Oregon minimum wage law. Pl Mot. at 1.

**I.  Intersection of Oregon & Federal Law**

Oregon's minimum wage statute provides that "no employer shall employ or agree to employ any employee" at a wage lower than the applicable minimum wage, which is defined in

subsequent sections.[2] OR. REV. STAT. § ("ORS") 653.025. The statute defines "employer" as

"any person who employs another person." ORS 653.010(3). " 'Employ' includes to suffer or

permit to work . . . ." ORS 653.010(2). ORS chapter 653 does not define "employee." See ORS

653.010; Cejas Commercial Interiors, Inc. v. Torres-Lizama, 260 Or. App. 87, 94, 316 P.3d 389,

393 (2013). "Although employee is not expressly defined in ORS chapter 653, by contextual

implication, an employee is a person who is 'suffer[ed] or permit[ed] to work.' " State ex rel.

Roberts v. Bomareto Enterprises, Inc., 153 Or. App. 183, 187, 956 P.2d 254, 255 (1998).

Obviously, these circular definitions do not provide the key to resolving the current

question, that is, whether Hurst and his fellow class members were considered "employees" of

First Student during the training program. The parties vigorously dispute how the analysis should

proceed from this crossroads.

First Student argues that Oregon's minimum wage law is based on a federal statute, the

Fair Labor Standards Act ("FLSA"), and that Oregon courts and judges in this District refer to

federal cases interpreting the FLSA to guide the analysis of terms like "employ" and "employer"

under Oregon law. Def. Mot. at 12–13. Accordingly, First Student posits that the Court should

apply a six-factor test created by the Wage and Hour Division of the United States Department of

Labor ("DOL") to assess whether "applicants who attend pre-employment training are

considered 'employees' under federal law. Def. Mot. at 2, ECF No. 46; see also Nance v. May

Trucking Co., No. 3:12-CV-01655-HZ, 2014 WL 199136, at *3 (D. Or. Jan. 15, 2014). The six

factors include:

---

[2] Notably, the Oregon Legislature recently adopted a new minimum wage rate, and the new version of the
statute went into effect while the parties' current motions for summary judgment were pending. See ORS
653.025. While the rates have changed, the operative language relevant to this motion (i.e., that "no
employer shall employ or agree to employ any employee at wages computed at a rate lower than . . .") is
identical, and the Court relies on Oregon state court and District of Oregon cases which interpret the
former version of ORS 653.025.

1)  The training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school.

2)  The training is for the benefit of the trainees.

3)  The trainees do not displace regular employees, but work under their close observation.

4)  The employer that provides the training derives no immediate advantage from the activities of the trainees; and on occasion operations may actually be impeded.

5)  The trainees are not necessarily entitled to a job at the conclusion of the training period.

6)  The employer and the trainees understand that the trainees are not entitled to wages for the time spent in training.

Opinion Letter Fair Labor Standards Act ("FLSA Letter"), 2004 WL 3177877, at *2.

This test is derived from Walling v. Portland Terminal Co., in which the Supreme Court held that individuals who participated in a practical training course for prospective railroad yard brakemen were not "employees" under the FLSA. 330 U.S. 148, 153 (1947). First Student asserts that numerous federal courts, including judges from this District have adopted the six-factor Walling test to "determine the employment status of trainees during pre-hire training." Def. Mot. at 15 (citing, among others, Barnhart v. Fastax Inc., No. 6:14-CV-00482-MC, 2015 WL 5056277, at *2 (D. Or. Aug. 26, 2015); Nance Trucking, 2014 WL 199136 at *3).

Hurst asserts that the Court cannot apply the federal test because the Court must apply Oregon law to this diversity action, and the DOL test "conflict[s] with Oregon's statutes, administrative rules, and case law. Pl. Reply at 1–2, ECF 66. He contends that the DOL/Walling test "ignore[s] all but the first eight words of" Oregon's minimum wage statute, "completely ignore[s]" Oregon's "more expansive definition of 'work time,' "and "further would require the

Court to ignore statutory prohibitions against agreements that circumvent . . . Oregon's minimum wage laws." Pl. Reply at 2.

Although Hurst is correct that, as a general matter, a federal court "sitting in diversity [must] apply state substantive law," Pl. Reply at 2, it is unquestionably appropriate for the Court to look to federal law to help understand and apply Oregon's minimum wage statutes. Oregon courts have repeatedly held that the Oregon legislature "adopted the FLSA's definition of 'employ' for the purpose of the state minimum wage law." Dinicola v. State, Dep't of Revenue, 246 Or. App. 526, 544, 268 P.3d 632, 642 (2011); Cejas, 260 Or. App. at 97 ("In patterning Oregon's minimum-wage provisions after the FLSA and adopting the FLSA's definition of 'employ,' the legislature adopted an established term of art from federal law."). Thus, Oregon courts asked to interpret Oregon's minimum wage statutes routinely rely on federal case law to analyze whether a particular working relationship is an employment one requiring the employer to pay the employee a minimum wage. See Cejas, 260 Or. App. at 94–96, 103–08; Dinicola, 246 Or. App. at 533–34.

The Ninth Circuit has not explicitly endorsed the DOT test as controlling law. Nance, 2014 WL 199136 at *4 (citing Williams v. Strickland, 87 F.3d 1064, 1066 (9th Cir. 1996)). Williams, however, relied on Walling and another Supreme Court decision to determine whether the plaintiff, who spent six months at an Adult Rehabilitation Center of the Salvation Army, was an employee of the Salvation Army under the FLSA. 87 F.3d at 1066 (citing Walling, 330 U.S. at 153; Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 301 (1985)). Moreover, each of the DOL factors is directly traceable to the Supreme Court's analysis in Walling, which is still good law and is controlling authority on this Court. Judges in this District have applied a variant of the DOL/Walling test to determine whether under Oregon and federal law, trainees

were actually employees and thus entitled to minimum wage. See Nance, 2014 199136 at * 5;

Barnhart, 2015 WL 505627. Thus, the Court will use the DOL test as a framework to determine

whether Hurst and the other trainees were employees under Oregon law. See infra Section II.

     The Walling test does not conflict with Oregon's statutes, rules, or case law as Hurst

claims. First, Hurst argues that the application of the Walling test would conflict with Oregon

statutes because the test "ignore[s] all but the first eight words of ORS  653.010(2)." Pl. Reply at

2. Hurst points to the enumerated exceptions to the definition of "employ" in ORS § 653.010(2)

and argues that, because First Student's training program does not qualify for any of the specific

exceptions, it must, therefore, meet the definition of employ and First Student must pay trainees

minimum wage. Pl. Resp. at 20.

     But that conclusion is not borne out by a plain reading of the statute. The relevant

statutory section is reproduced here:

> "Employ" includes to suffer or permit to work but does not include voluntary or
> donated services performed for no compensation or without expectation or
> contemplation of compensation as the adequate consideration for the services
> performed for a public employer referred to in subsection (3) of this section, or a
> religious, charitable, educational, public service or similar nonprofit corporation,
> organization or institution for community service, religious or humanitarian
> reasons or for services performed by general or public assistance recipients as part
> of any work training program administered under the state or federal assistance
> laws.

ORS § 653.010(2). There is no indication that the legislature intended the rigid dichotomy that

Hurst advocates. The statute contains two distinct parts. First, it states what types of relationships

are encompassed by the term "employ"—it includes "to suffer or permit to work." The

remainder of the statute describes particular relationships that fall outside the definition of

"employ." The legislature's use of the word "includes" in the first section does not suggest, as

Hurst asserts, that every relationship that does not meet one of the enumerated exceptions is necessarily an employment one.

To ground this abstraction in the facts of this case, even if the Court assumes that First Student's training program does not qualify under the express statutory exemptions, the Court still must ask whether First Student employed Hurst and the other class members. See ORS 653.025(1) (providing that "no employer shall employ or agree to employ any employee" at a wage lower than the applicable minimum). The only direction the Oregon legislature gave about what "employ" means is that it "includes suffer or permit to work." ORS 653.010(2). That phrase, as the Oregon courts have described it, is "an established term of art" that the "[Oregon] legislature adopted . . . from federal law." Cejas, 260 Or. App. at 97. The DOL/Walling test is a federally-developed test to evaluate whether an individual engaged in a training program is actually employed, i.e., whether that person was suffered or permitted to work. See Walling, 330 U.S. at 152 (noting that the FLSA "defines 'employ' as including 'to suffer or permit to work' " and analyzing whether the brakeman training program met the definition). Thus, there is no conflict between the application of the DOL/Walling test and Oregon's minimum wage statute.

Next, Hurst  argues that the Court cannot apply the DOL/Walling test because it does not account for Oregon's statutory definition of "work time." See Pl. Reply at 2. Hurst repeatedly contends that First Student's driver training qualifies as "work time" under Oregon statutes and regulations. Pl. Mot. at 10–12; Pl. Reply at 2–4; Pl. Resp. at 4–5. That may be true, but Hurst's argument puts the proverbial cart before the horse. Oregon's minimum wage statute provides that "for each hour of **work time** that the **employee** is **gainfully employed**, no employer shall employ or agree to employ any employee at wages" below the applicable minimum. ORS 653.025(1) (emphasis added). "Work time" is defined and "includ[ing] both time worked and

time of authorized attendance," ORS 653.010(11), and BOLI has promulgated an administrative rule which provides that training is compensable work time, unless a certain set of factors are met. See OR. ADMIN. R. 839-020-0044. In other words, "work time" is simply that time for which an "employee" must be compensated; the Court must still determine whether the individuals involved are "employees." See Ulrich v. Alaska Airlines, Inc., No. C07-1215RSM, 2009 WL 364056, at *3 (W.D. Wash. Feb. 9, 2009) (rejecting similar argument based on a nearly identical "four-factor test for determining [under the FLSA] whether time spent in training programs is compensable time . . . . The four factors address whether the attendance at the training is voluntary, whether it takes place outside regular working hours, whether productive work is performed, and whether the training is directly related to the employee's job. These factors clearly apply only to **employees,** not trainees."); Helde v. Knight Transp., Inc., 982 F. Supp. 2d 1189, 1199 (W.D. Wash. 2013) (declining to apply similar Washington guideline regarding "hours worked" because it "presupposes the existence of an employee-employer relationship[.]"). Hurst's briefing seems to recognize this distinction when he correctly identifies that that are two questions here: 1) whether Hurst was an employee during the training, and 2) whether the training was compensable. Pl. Mot. at 1. Hurst's "work time" argument incorrectly collapses those separate inquiries into one.

Hurst also contends that the application of the DOL/Walling test "would require the Court to ignore statutory prohibitions against agreements that circumvent . . . Oregon's minimum wage laws." Pl. Resp. at 2 (citing ORS 653.055(2) and 652.360). ORS 653.055(2) provides that "[a]ny agreement between an employee and an employer to work at less than the wage rate required by ORS 653.010 to 653.261 is no defense to an action" against an employer for failing to pay a minimum wage. ORS 652.360 states that "[a]n employer may not by special contract or

any other means exempt the employer from any . . . statute relating to the payment of wages[.]"
Hurst's argument on this point fails for the same reason that his "work time" argument failed:
these statutes only apply where an employment relationship exists. Neither are relevant or
helpful to resolving whether Hurst and his fellow classmates were employees of First Student
during the training program.

Hurst then resorts to an examination of the legislative history of Oregon's minimum
wage statute to argue that Oregon legislature intended to move away from the DOL/Walling test.
Pl. Resp. at 2–5. He points first to the language, excerpted above, from the Oregon law carving
out certain relationships from minimum wage requirements. Hurst contends that since
overhauling Oregon's minimum wage in 1967, the legislature has specifically excluded some
relationships from the minimum wage requirements. Pl. Resp. at 6–7, ECF 60. Accordingly, he
argues, the legislature could have excluded training programs based on the DOL/Walling test but
did not, which indicates that the legislature "intentionally moved away from the FLSA's
definition [of 'employ'] and whether training is work time based upon Walling." Pl. Resp. at 3–
4, ECF 60.

But the Oregon Court of Appeals in Cejas already analyzed the text, context, and
legislative history of the statute at issue here and concluded that (1) it was modeled after the
FLSA, (2) the Oregon legislature intended to adopt the FLSA's definition of "employ" as
including "suffer and permit to work," and (3) that courts should look to federal law in
interpreting and applying Oregon's minimum wage laws. Cejas, 260 Or. App. at 97–103. The
exploration of the statute's text and history in Cejas is exhaustive and well-reasoned, and without
more convincing authority from Hurst about how the Oregon Supreme Court may rule on the
issue, this Court is bound to follow the appellate court's interpretation. See In re Kirkland, 915

F.2d 1236, 1239 (9th Cir. 1990) (explaining that a federal court sitting in diversity is bound to follow decisions of the state's highest court and, in the absence of convincing evidence that the state's highest court would decide differently, is bound to follow decisions from the state's intermediate courts).

Finally, it is significant that BOLI itself provides the six-part DOL test as "Technical Assistance" to employers for analyzing whether trainees must be paid for their time. See Technical Assistance for Employers – Interns and Trainees, OREGON.GOV, http://www.oregon. gov/boli/TA/pages/t_faq_interns.aspx (last visited Mar. 16, 2016). Without conclusively determining the legal effect of such a notice, it would be inconsistent as a practical matter for BOLI, the agency tasked with enforcing Oregon's wage laws, to tell employers to use the DOL test, and this Court, on the other hand, to tell employers that the application of the DOL test conflicts with Oregon law.[3]

Hurst cites to numerous contested case hearing from BOLI and a Multnomah County Circuit Court case which ruled that a training program was compensable as minimum wage. Those authorities are unpersuasive. The BOLI cases Hurst provided are decades old, and all but one predate the DOL's adoption of the six-part test through an opinion letter published in 2001. See Opinion Letter Fair Labor Standards Act (FLSA), 2001 WL 1558755, at *1; see also In re Farmers Ins. Exch., Claims Representatives' Overtime Pay Litig., 481 F.3d 1119, 1129 (9th Cir. 2007) (explaining generally the legal effect of DOL opinion letters and how courts should interpret them).

---

[3] The Oregon Supreme Court has also turned to Technical Assistance posted on the BOLI website to assist in interpreting Oregon's wage and hour statutes and regulations. See Gafur v. Legacy Good Samaritan Hosp. & Med. Ctr., 344 Or. 525, 535, 185 P.3d 446, 452 (2008) ("In fact, BOLI's own website states that employers may require employees to remain on the premises during rest breaks. Clearly, BOLI considers rest breaks to belong to and be controlled by the employer.") (citing Breaks: Meal And Rest Period, Technical Assistance: FAQ, www.boli.state.or.us/BOLI/TA/T_FAQ_Restandmeal.shtm).

More importantly, none of the BOLI decisions address the factual situation here—whether an individual who must complete a mandatory training program before performing any productive work is considered an "employee" during training. For instance, Hurst repeatedly quotes a line from In re Dan's Ukiah Svc., 8 BOLI 96, 106 (1989), in which BOLI wrote that "training time is considered a cost of doing business for an employer." See Pl. Mot. at 12; Pl. Reply at 6; Pl. Resp. at 8, 9. But in that case, the claimant was trained to work on a logging truck owned by the same family who owned and operated the gas station where the claimant was already employed and working. In re Dan's Ukiah Svc., 8 BOLI at 100–01. There was no dispute that the owner employed the claimant and therefore, the Oregon definition of "work time" applied and the training was compensable. Id. at 106.

Even the most closely analogous BOLI decision (and the only one decided after the DOL adopted the six-part test in 2001) is easily distinguishable. The claimant in In re Mitre, 23 BOLI 46 (2002), was hired to drive a tractor-trailer for a round trip from Portland, Oregon, to Tacoma, Washington. Prior to the trip, the claimant requested to "ride along" with the employer to "learn the ropes." Id. at 50. The employer agreed, and took the claimant along for a job the employer had that week. Id. The claimant actually drove the truck and helped tie down at least one load during the job. Id. This "training," BOLI ruled, was "directly related to his job duties and during the training Claimant performed productive work for" the employer. Id. at 55. Thus BOLI found the training was compensable. Id. at 54–55. Again, the question whether the claimant was employed was not disputed. Moreover, the claimant performed productive work for the employer during the training. Hurst does not dispute that he did not perform any productive work for First Student during the training program.

The Multnomah County Circuit Court case that Hurst provided is only two pages long and does not describe the facts of the case, significantly lessening its persuasive value. <u>See</u> Moore Decl. Ex. 30 at 1–2, ECF No. 50-30. Moreover, the Circuit Court's conclusion that the driver training was compensable was apparently based solely on the statutory definition of "work time." <u>Id.</u> This Court respectfully disagrees with that conclusion. As explained above, "work time," as defined by Oregon statute, only applies to "employees." <u>See</u> ORS 653.025(1) (providing that employers must pay at least the minimum wage "for each hour of work time that the **employee** is gainfully employed.") (emphasis added). A plain reading of the statute in context does not suggest that the definition of "work time" has any relevance to the definition of "employ" or "employee."

## II. Application of the DOL/<u>Walling</u> test

The Court now turns its attention to the six-part DOL test and its application to the facts of the present case. The test, as stated above, is as follows:

1. The training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school.

2. The training is for the benefit of the trainees.

3. The trainees do not displace regular employees, but work under their close observation.

4. The employer that provides the training derives no immediate advantage from the activities of the trainees; and on occasion operations may actually be impeded.

5. The trainees are not necessarily entitled to a job at the conclusion of the training period.

6. The employer and the trainees understand that the trainees are not entitled to wages for the time spent in training.

FLSA Letter, 2004 WL 3177877 at *2. Despite the unequivocal language from the DOL (and

BOLI) that "all six" of the criteria must be met for the trainee to fall outside of the minimum

wage requirements, courts have resisted adopting such an "all or nothing approach." Helde, 982

F. Supp. 2d at 1199. Nothing in Walling suggests such rigidity, and many courts have instead

used the DOL test as a flexible framework for evaluating the "economic realities of the

relationship between the alleged employer and the trainees." Harris v. Vector Mktg. Corp., 753

F. Supp. 2d 996, 1006 (N.D. Cal. 2010); see also Williams, 87 F.3d 1064, 1066 (9th Cir. 1996)

(using Walling as "guidance," but applying the Supreme Court's "economic reality" test to

determine employment). Finally, and perhaps most importantly, Oregon courts have specifically

adopted using the flexible "economic realities" test in evaluating whether an employment

relationship exists, albeit in a different factual context than the one examined here. See Cejas,

260 Or. App. at 103 ("We will apply the economic-realities test to determine whether a given

relationship is an employment relationship under ORS 653.010(2).").

     Thus the Court examines the "economic realities" of the relationship between Hurst and

First Student to determine whether an employment relationship existed, using the DOL test as

guide. Moholt v. Dooney & Bourke, Inc., 63 F. Supp. 3d 1289, 1310 (D. Or. 2014) ("[I]n

determining whether a worker is an 'employee' to whom Oregon's state minimum wage law

applies under [ORS] 653.025(1), the applicable standard is the 'economic realities' test.") (citing

Cejas, 260 Or. App. at 97–100). This careful distinction is, however, largely academic. The

Court has thoroughly reviewed the facts raised by both parties and finds that those most relevant

to the analysis fit into one or more of the DOL/Walling factors. Each of the six factors in this

case favors First Student. Therefore, the Court concludes that First Student did not employ Hurst

or the class members during its driver training program.

### 1. Training similar to vocational school

This first factor favors First Student. Trainees spent the vast majority of the approximately forty training hours in both the classroom and behind-the-wheel contexts learning the skills needed to drive a school bus for any employer, not just First Student. Moore Decl. Exs. 8, 9, ECF 50–8, 50-9; Hurst Dep. 86:9–18; Smith Decl. Ex. I ("Stipulated Facts") ¶ 7, ECF 47-10. Much like a vocational school, First Student trainees who successfully complete the program could use the training to become drivers for other companies. After they complete First Student's program, trainees are certified by state-approved, third party trainers as eligible to receive a Class B license endorsement which permits them to drive, among others, school buses, dump trucks, and passenger vehicles with sixteen or more riders. Van Criddle Dep. 12:3–9; Hurst Dep. 20:10–20. The human resources director for First Student in Oregon testified that the company has "lost a number of trainees that have taken [the] training and gone to another school district, [or] gone to another school bus competitor." Moore Decl. Ex. 4 ("Thullen Dep.") 28:12–23, ECF 50-4.

The training did cover some topics specific to employment with First Student, but Hurst could not recall the specific time spent on First Student topics, and he testified that most were addressed in a few minutes. Hurst Dep. 86:9–18. One exhibit includes a breakdown of the classroom training topics with the approximate time spent on each. Moore Decl. Ex. 9. According to his report, Hurst spent about 1500 minutes, or twenty five hours, on topics that relate to school buses generally (i.e. "Pre & Post Trip Inspections," "Emergency Evacuations," and "Following Distance"). The only First Student specific topics are listed at the bottom of the page but there is no information about the time spent on these subjects. And, given Hurst, his trainer, and training manager certified that he spent twenty-four hours in the classroom training, the First Student-specific topics could not have covered more than a few minutes. Contra Helde,

982 F. Supp. 2d at 1200 (finding that driver training was not similar to vocational school because approximately half of the training time was spent on employer-specific topics).

Hurst argues that the program is not like a vocational school because he went through an interview process, received a Contingent Offer of Employment, and could have been dismissed from the program at any time, which suggests that First Student is acting as an "at-will" employer. Pl. Resp. at 11. That argument is inapposite. For one, the brakemen-trainees in Walling similarly were "accepted for the [railroad's] training course," but the Supreme Court did not consider that fact relevant in concluding that the instruction the trainees received from the railroad company did not create an employment relationship. Walling, 330 U.S. at 152–53. Second, and relatedly, the focus of this factor is whether the type of instruction at the training program is similar to a vocational program, not whether the two share a similar administrative structure or admission process. See FLSA Letter, 2004 WL 3177877, at *2 ("The **training** . . . is similar to that which would be given in a vocational school.") (emphasis added).

### 2. Training for the trainees' benefit

This factor also favors First Student. As explained above, successful trainees were tested and certified to receive a Class B CDL, which allowed them to drive a range of heavy vehicles. Thus, First Student's training program taught skills which were transferrable to other bus driving companies or other transportation providers, which primarily benefitted Hurst and the other trainees. See Petroski v. H & R Block Enterprises, LLC, 750 F.3d 976, 981 (8th Cir. 2014) (finding that so-called "rehire trainees" were not employees under the FLSA based, in part, on the transferrable skills they learned during the training); see also Barnhart, 2015 WL 5056277 at *5 (finding that a company's tax preparation training program primarily benefitted the trainee because she "received basic income tax law education that met state licensing requirements" and

did not prepare any customer's tax returns). As previously mentioned, First Student produced

evidence that the company lost a number of trainees to other school districts and competitors.

Thullen Dep. 28:12–23.

Hurst's assertion that the training did not benefit him because First Student had a

monopoly over school bus services in certain school districts is unavailing. Pl. Resp. at 16–17.

Hurst's own testimony shows that the Class B CDL could be used for a number of other driving

jobs in other industries. Moreover, there are well over one hundred school districts in Oregon

that do not contract with First Student, meaning Hurst and the class members had ample

opportunity to use their new bus driving skills for other companies or school districts. See Moore

Decl. Ex. 11 at 23, ECF 50-11; see also Second Supp. Smith Decl. Ex. N, ECF 70.

### 3.  Worker displacement

This factor favors First Student. None of the First Student driver trainees performed any

productive work for First Student because they could not drive a school bus with students on

board until they completed the training and secured the required certificates and licenses. Hurst

does not contest this conclusion. Pl. Resp. at 13. (Hurst "does not assert that class member

transported students or displaced drivers who were transporting students for First Student.").

### 4.  No immediate advantage for the employer

This factor, too, favors First Student. First Student receives no immediate advantage from

the training program because the trainees do not drive any routes or perform any productive

work for First Student until after they have completed the program. See Nance, 2014 WL 199136

at * 5 (finding the defendant, a truck driving company, did not derive an immediate benefit from

a driver orientation program in which trainees did not displace any regular employees, and did

not perform any productive work for the company); Ulrich, 2009 WL 364056, at *7 (finding that

the defendant-employer did not derive an immediate benefit from a flight attendant training

program, even though the trainees served some passengers on training flights, because the

"airline still had to staff the airplane with a full complement of regular flight attendants.").

Hurst contends that "[b]y using its ability to train [a] significant number of drivers, and

by using the quality of the training program itself as a marketing tool, [First Student] derives

immediate advantage in obtaining paying clients[.]" Pl. Resp. at 13–14. As an initial matter,

Hurst's assertion about why a school district may have chosen First Student's bid over others is

purely speculative and not supported by any evidence in the record. Moreover, the question is

not whether First Student derives any benefit at all from its training program; it is whether that

benefit is "immediate." Ulrich, 2009 WL 364056 at *5 ("The law presumes that [the defendant]

will derive 'some' benefit from offering training to prospective employees," but "the relevant

question is whether that benefits is 'immediate.' "). Even assuming the quality of First Student's

training program improves its chances of securing a particular bid with a school district, that

benefit is too far attenuated from Hurst's participation in the program to conclude that Hurst's

training provided First Student some "immediate" benefit.

To the extent Hurst is arguing that First Student benefitted because its training led to a

pool of qualified drivers from which First Student can staff its bus routes, the Supreme Court in

Walling already considered and rejected that theory of "immediate advantage." 330 U.S. at 153

("Nor could [the brakemen-trainees] have been considered as employees of the railroad merely

because [they] would constitute a labor pool from which the railroad could later draw its

employees. The [FLSA] was not intended to penalize railroads for providing, free of charge, . . .

instruction . . . which would most greatly benefit the trainees.").

//

### 5. Guaranteed job

This factor favors First Student. It is undisputed that Hurst understood he was not guaranteed a position with First Student even if he completed the training program. Hurst Dep. 68:24–69:7. Hurst insists that he and the other class members were entitled to a job because they all received a Contingent Offer of Employment and First Student admitted that 95 to 97 percent of the people who completed the training went on to work for First Student as bus drivers. But the Contingent Offer of Employment was exactly that: contingent on Hurst and the class members successfully completing the training program, passing the background and drug screenings, and securing the proper permits and licensing. Moore Decl. Ex. 17 at 1. That the vast majority of trainees went on to be First Student employees does not change the fact that employment offers were explicitly contingent on, among others, the trainee completing the training and that Hurst knew that he was not necessarily guaranteed a job once he completed the training.

### 6. Mutual understanding regarding pay

This final factor also favors First Student. Both Hurst and First student understood the training was unpaid. Hurst Dep. 64:15–65:15. Hurst's attempt to create an implied agreement for compensation based on the Contingent Offer of Employment is unavailing. Pl. Resp. at 16–17. The express language of the Contingent Offer states that driver trainees "will be paid a one-time bonus . . . after successfully completing all licensing and training requirements." Moore Decl. Ex. 17 at 1. There is nothing in the agreement from which the Court can imply that the parties believed or expected that training time was otherwise compensable. Finally, Hurst's argument that Oregon's wage statutes prohibit an agreement between and employer and employee to be paid less than minimum wage is simply not applicable here. Pl. Resp. at 16 (citing ORS

653.055(2), 652.360). As explained above, those statutes presume that an employment relationship already exists. See also Ulrich, 2009 WL 364056, at *7 (rejecting a similar argument based on FLSA because the trainee "was not an employee during training [and therefore] had no FLSA rights to waive.").

CONCLUSION

For the reasons stated, Hurst and the class members were not employees of First Student during the driver training program. Therefore, First Student was not required to pay the class members minimum wage for time spent in the training program. First Student's motion for summary judgment [46] is granted. Hurst's cross-motion for summary judgment [49] is denied.

IT IS SO ORDERED.

Dated this _____ day of _____, 2016.

MARCO A. HERNÁNDEZ
United States District Judge